I'd like to reserve two minutes for rebuttal. Can I ask you a jurisdictional issue first because I couldn't find it in the record? Under Rule 11A2, the district judge has to approve the conditional guilty plea, right? Yes. The district judge in the judgment put that appeal was waived. Did the district judge actually ever approve of the appeal? Or was it something that was never done? Well, my recollection is that there was a provision in the plea agreement that provided for a right to appeal. We had plea proceedings before Judge Garcia. I can't recall offhand whether it was discussed, but I think it was absolutely clear from his review of the plea agreement that that was agreed upon. Because it's not in the docket on the minutes. Did he say, I accept the plea agreement? I can't say. I mean, my assumption is yes. I was present in court. We went through the standard plea colloquy. He accepted the plea agreement. Wait. That's two different things. There's the plea and the plea agreement. The court judge, he knows. Right. So I'm just wondering, and if he didn't, do we have jurisdiction? Well, I know that I guess the best answer I can provide the court is that there was a plea agreement that the court reviewed that included a provision allowing for appeal. Right. I don't think that there was an on-the-record discussion about a right to appeal. It's something that I can go back and look in the record for. When he sentenced him, did he advise him of his right to appeal? I don't recall offhand. Do you have the record with you? I don't have the full. You could probably look at it at either the plea colloquy to see if he postponed accepting that or the sentencing to see if he accepted the plea agreement at the time. I don't have with me a transcript of the plea colloquy or the sentencing. I can, within a matter of days, get copies of that. I would have to order it, I imagine, from the court reporter. It's an issue that I can. Maybe the government will be able to help us out. I'm afraid I'm not able to. I did not have a pattern in the district court. I don't have a transcript of the proceedings. All right. All right. Why don't we proceed with the merits, and we'll have to take a look at the jurisdictional question. This Court's precedent makes it clear that the standard for establishing probable cause that a parolee resides at a particular location is a stringent standard. Officers are expected to engage in significant investigative steps before they enter a third-party residence pursuant to a parole search condition. What we had here was a team of parole intervention officers whose motivation and goal was to find Mr. Daniels as quickly as possible and place him under arrest on a warrant. And, indeed, what we saw in this case was a situation where the officers were entered without a warrant this residence the exact same day that they learned of Mr. Daniels. Our position is that that cursory investigation was insufficient to meet the stringent standards set out in Howard. And it's for that reason that our position is that even if this Court were to defer to the credibility findings made by the district court, reversal is appropriate. That said, our position is that there are significant reasons to question the credibility findings made by the district court. I say that recognizing that the standard that this Court applies to factual findings by the district court sets a high bar for us. I recognize that it's a clear error standard. But this is a rare case in which the testimony of the key government witness was directly contradicted by three separate witnesses. Two of those witnesses had absolutely no connection to Mr. Daniels, totally unconnected. One of them was a government witness. That government witness was the apartment manager that the officer claimed to have heard from that Mr. Daniels lived in this apartment. That witness was completely unimpeached. There was no evidence that she had any trouble remembering what had happened on that day. And, in fact, she provided further details about showing the lease agreement to the police officer that was, again, unimpeached. If we were to go that way, wouldn't we be saying almost as a matter of law that if a police officer testifies one way and three unbiased witnesses testify the other way, that it's a clear error to accept the police officer's testimony even if you watch the demeanor? I think that what this Court can do is look at the record in this particular case and evaluate whether there was any basis in the record for the district judge to disbelieve the testimony of these two individuals. But couldn't they? I mean, I do this. This is my living. I watch people testify. I get a feel from the way they answer questions in cross-examination. I watch their appearance. Do they fight with the attorney? Do they correct themselves? You know, you get a feel for the whole situation. And we don't get that. Notwithstanding that I read the transcript of the testimony, you still don't get the same feel. And how do we discount for that? Well, I recognize that. And I think what this Court can do is look at the wording in the record but also look at the explanation given by the district judge for his credibility findings. And what we saw is, first of all, just based on what you can see from the record is there's no second guessing or no questions raised about the testimony of these two witnesses. Is the district judge required to give reasons as to why he's rejecting the testimony? We do that with administrative law judges. We say, like in Social Security, they have to give us reasons for rejecting the claimant's testimony. But have we done that? Is there any case that says that the district judge has to set forth all the reasons that they're accepting or rejecting credibility? Well, I think in order to review a district court's holding, there has to be some way for this suggestion by the district court that I credit this person's testimony over that person's. Typically what one sees is a district judge saying, well, there were situations in which this witness was having trouble remembering things. For example, one thing this Court could credit with respect to the district judge's evaluation of the testimony of Tamia Pickens, Mr. Daniel's friend, was that he said that person was a partner of Mr. Daniel's. There's a clear bias or motivation to lie. Our position is that that was an incorrect finding, but I can understand how this Court could evaluate the judge's reasoning under those circumstances. How did they know about, was it a Dodge Neon? And he put in his report, he said that the manager told him that Pickens had a Dodge Neon, and if the Dodge Neon was there, then he would know that they were in the house. Well, if the manager didn't say that or someone didn't say that to the police officer, how would the police officer have known that? Well, one possible way is after performing the arrest to have spoken with Miss Pickens and learned more about her and her vehicle, to have engaged in an after-the-fact justification of this search. Anything in the record to show that that's what occurred? No, there is not. But there also is nothing in the record beyond this officer's testimony that this is actually what occurred. In fact, the two people from the apartment management office said, no, we absolutely did not tell this person that this woman drove a Dodge Neon. But somehow we knew that. Apparently, yes. But given what this officer was saying with respect to his inability to recall significant details, our position is that it was clear error to rely on that testimony. But you were the lawyer below, right? Correct. So you could have interviewed, you probably did, Miss Pickens, and if Miss Pickens said that, well, the officer asked me later on after he took Daniels into custody about the Neon and where did I get it and does Daniels ride in it, et cetera, you could have put that on to explain it. But the record before us is just that the officer knew about the Neon, which turns out to be a true fact, and he said he got that from the manager. There's no other explanation as to where he got that from. The manager says no. The district judge believed that the manager did tell him that or that someone in the office told him that. Well, that is true. But, again, we have the actual source that it's attributed to, that this information is attributed to saying that's not something that they said. And even if this Court were to credit that testimony, the standard in Howard, like I said, is very stringent. And in Howard, this Court talked about a whole series of steps that officers should take. Those steps were not taken in this case, and for that reason, first of all, our position is you shouldn't credit or you shouldn't find that the Court was correct in crediting that testimony. And further, that even if you do, this Court should reverse based upon the failure to meet that standard in Howard. I'll reserve the ---- All right. Thank you, counsel. You have four seconds. Good morning, Your Honors. My name is Lawrence Brown. I'm an assistant United States attorney with the Eastern District of California in Sacramento. Your Honors, this case involves a fugitive parolee who fled from his last reported address after assaulting his live-in girlfriend. How do you know that he fled from that second address? Well, the state parole authorities, who have responsibility for supervision of Mr. Daniels, ultimately issued a warrant and said that he was a fugitive and that his location and whereabouts were, quote, unknown. And so it was the last address that he had lived at was this Fulton Avenue apartment where he had assaulted the live-in girlfriend, Ruth Piamonte, on June 9th. Notification to Sacramento Police Department came in on June 12th saying that ---- He had to be somewhere, so the police went to the address listed before the Fulton address, and that's how they came up with the San Juan apartments? Well, you know, the officer, I guess using his eight-year veteran instincts, thought to go ahead and find a phone number associated with Mr. Daniels. And that's not clearly in the record how he found the phone number. It says ---- Through county records. Through what? County records. There must have been probation records as well, I'm assuming. But he, whatever the circumstances were ---- He found the number. Yes, I'm sorry. He was searching on his computer for the number? Is that what you're saying? Yes. Searched the county records? Yeah, I ---- That's not clear. It's uncontroverted that the officer, on June 29th, after reviewing the fugitive declaration, the warrant by state parole authorities, successfully reached Mr. Daniels on a cellular telephone. So it was a cell phone number? Cell phone. And Daniels answered? Daniels answers the phone. And the officer uses a ruse and says he's with a temporary employment agency, I've got some documents for a potential job. Again, this is a savvy officer who didn't say, Hi, I'm Officer Baptista, I have a warrant for your arrest, where might I find you? And so the officer, after making the inquiry, Mr. Daniels hands the cell phone over to his new old girlfriend, Ms. Pickens. When he asked for the address. Right. So he's not sure of the address. She says it's 823 San Juan Road, Apartment 41. He's moved back in with me. Then Mr. Daniels gets back on the cell phone. Mr. Daniels volunteers. Yes, I've moved back in with my old girlfriend. That's how. That's the testimony that your opposing counsel says was in direct conflict with. No, really. Yes, Your Honor, yes. He certainly, he doesn't spend as much time as the apartment management employees, but certainly they question whether or not there was clear error on the officers, on the court's part in adopting the officer's version that Mr. Daniels and Ms. Pickens said that Mr. Daniels was living now at San Juan Road. You see, for the officer, it's also relevant to the officer that addressed, because that was his second to last reported address. This isn't just any old address, and that's why I brought to this court's attention by way of 28J letter last week, the mayor decision, because the four Howard factors don't specifically articulate what mayor speaks to, which is that if there is a previously reported address associated with a probationer or parolee that is the search location, that does in fact provide some basis to corroborate that that is now the probationer or parolee's residence. And so I think it's yet another factor. I mean, this circuit has grappled, I know, with this issue, has put out a fair number of decisions. Howard laudably attempts to identify these factors, which is terrific. But the court also, I think, logically says, you don't need all four. We're not sure what the threshold is, but here are some of the factors. And as I said in my brief, I think that they saved the most probative for last, namely the statement of the parolee or of the cohabitant that the person's living at the searched residence. That's what we have here. Why in the world would the officer go back to Fulton Avenue and conduct surveillance when he's reached Mr. Daniels on the phone? So this case really entirely turns on the credibility determination. Because I agree with you. It's logic. Well, I mean, the question is, was the credibility determination clearly erroneous? Well, certainly. But I say also that you have incontroverted facts that he was a fugitive. He did flee his last residence. It's also reasonable to infer he didn't return. After he beat her up, he didn't return. Right. It would be reasonable to infer that he wouldn't go back because she was the victim. I'm not sure about that. Isn't it classic in domestic violence cases that the perpetrator tends to return? Well, there's certainly that. Trying to run away? Yes. I mean, it certainly can happen. I don't think you can call it a. . . So I don't think that's the only logical inference from that particular. . . But, again, we're talking about what's reasonable. What's reasonable for an officer to infer under the circumstances. The record also showed that Mr. Daniels threatened Ms. Piamonte that if she were to call the police, that he would cause injury to her. This isn't someone who's trying to make up. On top of that, he goes back and moves in with his old girlfriend. That much we also know. So I think the relationship that occurred between. . . The credit officer. The officer. I mean, see, that's my point is that it just all comes back to did the district court clearly err over the other witnesses? It's a close case, but, I mean, it's. . . And it's a well-argued case. Well, and certainly appreciate that remark, and I'm sure Mr. Smock does as well. I do think that it is. . . I think it's better argued on the government's part. No, it's. . . What about the. . . Well, absolutely. I think, Your Honor, in questions to opposing counsel, it is corroborative that the apartment. . . The officer testifies under oath that he's told that there is a white Dodge Neon. If it's in the carport, that means they're likely home at Apartment 41, and there is the Dodge Neon as they're going over to the apartment. There was nothing to suggest that the officer took these extraordinary steps of making up that fact after the fact. There's no Brady material of him, you know, seeing vehicles and doing checks on them to find out who the Neon belonged to? No, there's not. But, again, the officer did the on-site corroboration that Howard anticipates, recognized it's a stringent standard, as counsel repeated, but the court did say it's stringent versus when a person spending the night at a location occasionally can be insufficient. I think the stringency is certainly an adjective that the court used, but we have to use the factors here, and the court did not commit clear error. Let me ask you one question on the sealed documents. I looked through those documents, and I'm going to be careful not to reveal. . . Which I did not, or the government did, because we don't have standing to review those. Okay. So you have not seen the. . . All right. So, Your Honor, with that, I would, again, just summarize that what we have here is someone who moved back in with his old girlfriend to a second-to-last reported arrest. Unquestionably, he was a fugitive, and for those reasons, we believe that the court should adopt and uphold the findings of the district court. Thank you. Thank you. Counsel, you have four seconds. All right. Did you . . . Well, can I ask you one quick question? You can come over here. Did you review the files that were submitted to the district court under seal? I did not, Your Honor. They were handed to the district judge, and he held onto them and performed a review on his own. All right. Thank you very much, and this case will be submitted.
judges: Thompson, Wardlaw, Moskowitz